# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| **RONNIE HANKINS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) **Case No: 4:15CV697 HEA** |
| | ) |
| **TERRY RUSSELL, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

## <u>OPIONION, MEMORANDUM AND ORDER</u>

This matter is before the Court on Plaintiff's Motion for Summary Judgment, [Doc. No. 18] and defendants' Motion for Summary judgment, [Doc. No.25]. The parties respectively oppose the others' motions. For the reasons set forth below, the Court grants defendants' Motion and denies Plaintiff's Motion.

### Facts and Background

Defendant has, in accordance with the Court's Local Rules, submitted a Statement of Uncontroverted Material Facts. Plaintiff failed to respond to Defendant's facts. Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 7-401(E) of this Court's Local Rules, Defendants' facts are deemed admitted. Local Rule 7-401(E) provides:

Rule 7 - 4.01 Motions and Memoranda.

(E) A memorandum in support of a motion for summary judgment shall have attached a statement of uncontroverted material facts, set forth in a separately numbered paragraph for each fact, indicating whether each fact is established by the record, and, if so, the appropriate citations. Every memorandum in opposition shall include a statement of material facts as to which the party contends a genuine issue exists. Those matters in dispute shall be set forth with specific references to portions of the record, where available, upon which the opposing party relies. The opposing party also shall note for all disputed facts the paragraph number from movant's listing of facts. All matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party.

Plaintiff is a 65-year-old male confined in the Missouri Department of Corrections.

Dr. Carl Bynum is a physician licensed to practice medicine in the State of Missouri and, during the times relevant to Plaintiff's complaint, was an Associate Regional Medical Director for Corizon, LLC. As part of his responsibilities as an Associate Regional Medical Director, Dr. Bynum reviewed referral requests submitted by the patient's treating physician providing medical care within the Missouri Department of Corrections' facilities.

Dr. Thomas Bredeman is a physician licensed to practice medicine in the State of Missouri and is an Associate Regional Medical Director for Corizon, LLC. Among his responsibilities as Associate Regional Medical Director, Dr. Bredeman reviews referral requests submitted by a patient's treating physician providing medical care within the Missouri Department of Corrections' facilities.

Dr. David Mullen is a physician licensed to practice medicine in the State of Missouri and, during the time relevant to Plaintiff's Complaint, was one of the site physicians providing care to patients at Eastern Reception Diagnostic and Correctional Center located in Bonne Terre, Missouri.

On January 18, 2011, the site physician conducted Plaintiff's annual physical exam, during which Plaintiff complained of abdominal pain in the upper right quadrant. The physician assessed an enlarged liver and ordered lab work, including a Hepatitis panel, and a chest x-ray relative to Plaintiff's complaint of abdominal pain. Because Plaintiff was asthmatic, he was being monitored in the asthma chronic care clinic, which included assessment by the chronic care clinic nurse and evaluation by the physician every six months. Plaintiff's January 25, 2011 lab work tested positive for Hepatitis C. On January 28, 2011, the site physician enrolled Plaintiff in the Chronic Care Clinic for Hepatitis ("Hepatitis CCC"), which includes regular examinations and monitoring of Plaintiff's condition. On January 31, 2011, the chronic care nurse counseled Plaintiff on his Hepatitis panel results. The nurse educated Plaintiff on Hepatitis C and informed Plaintiff that interferon and ribaviron are sometimes used to treat Hepatitis C, depending upon factors including the lab test results, a liver biopsy (when indicated) and the absence of contra-indications to the drugs.

On January 27, 2011, Plaintiff's lab results showed Plaintiff's liver function was within normal limits (i.e. the ALT, AST, Albumin and Bilirubin results were within the reference range).

On February 3, 2011, Dr. Mullen examined Plaintiff as part of a chronic care clinic appointment for Plaintiff's Hepatitis C. Plaintiff reported feelings of fullness or swelling of the right upper abdominal quadrant; that the prison food caused nausea and dizziness; and that Plaintiff felt tired all of the time. Plaintiff also reported no tattoos, IV drugs or intercourse within the past 30 years but stated that he had a blood transfusion in 1990. Dr. Mullen observed Plaintiff's abdomen to be soft and non-tender and noted no hepatosplenomegaly[1] and no tenderness over the gallbladder. Dr. Mullen also found no physical findings suggesting that Plaintiff had cirrhosis of the liver. Dr. Mullen reviewed Plaintiff's lab results and assessed Plaintiff's condition as stable. Dr. Mullen prescribed Dicyclomine for Plaintiff's complaints of abdominal pain and nausea, which Dr. Mullen associated with Plaintiff's gallbladder. Dr. Mullen also ordered a regimen of care for Plaintiff including chronic care clinic appointments every six (6) months; labs drawn every 12 months; and testing for Plaintiff's Hepatitis C viral load ("hcv rna") to determine Plaintiff's viral count.

---

[1] Hepatosplenomegaly is the swelling of the liver and spleen beyond their normal size. See https://www.nlm.nih.gov/medlineplus/ency/article/003275.htm.

On February 3, 2011, Dr. Mullen submitted a referral request for the HCV RNA quantitative study, which was approved. On February 10, 2011, Plaintiff was evaluated by Dr. Mullen for complaints of abdominal pain, bloating, right upper quadrant pain, eructation [belching] with meals, cramping and back pain. Dr. Mullen reviewed Plaintiff's lab results and noted that his liver enzymes were stable. Dr. Mullen also noted that Plaintiff's abdomen was tender. Suspecting gallbladder disease, Dr. Mullen submitted a referral request for an upper abdominal ultrasound, which was approved. On February 22, 2011, labs were drawn for the HCV RNA quantitative test, which was received on April 11, 2011. On February 23, 2011, Plaintiff had an x-ray taken of his upper abdomen.

On March 25, 2011, a nurse assessed Plaintiff for complaints of stomach pain, which he reported increased when he ate greasy or sweet foods. The nurse recorded Plaintiff's vital signs and observed bowel sounds present and normoactive in all quadrants. The nurse also noted that Plaintiff presented with no signs of distress. The nurse referred Plaintiff to the site physician for follow up. On April 4, 2011, Dr. Mullen examined Plaintiff during a follow-up appointment to review Plaintiff's ultrasound results. Dr. Mullen noted that the ultrasound results showed a normal right kidney with cyst, the liver presented with some fatty infiltrate, the pancreas was not able to be evaluated, the gall bladder was poorly visualized and the study was unable to confirm or refute stones or wall thickening.

Dr. Mullen assessed Plaintiff's symptoms as "highly suspicious for cholecystitis" [i.e. inflammation of the gallbladder] and referred Plaintiff for a HIDA scan for confirmation of gallbladder disease. On April 4, 2011, Dr. Mullen submitted a referral request for a HIDA scan. Dr. Bynum recommended an alternative treatment plan of a CCK-HIDA scan.[2] Plaintiff failed to report to the medical unit on April 5, 2011 and May 2, 2011 to allow for a medical assessment of his complaints of right side pain.

On June 14, 2011, Dr. Mullen examined Plaintiff for complaints of acute back pain. Dr. Mullen observed that Plaintiff presented with a normal gait, muscle strength, tendon reflex, perianal sensation, posture, range of motion and hamstrings. Dr. Mullen also observed tenderness on Plaintiff's left thoracic spine, hip and pelvis and assessed Plaintiff with a low back strain. Dr. Mullen prescribed Plaintiff meloxicam for pain management and an exercise program and requested a follow up with Plaintiff in six months. On June 21, 2011, Dr. Mullen examined Plaintiff based upon Plaintiff's complaints of back pain and a chest rash. Dr.

---

[2] According to the Mayo Clinic's website, a "hepatobiliary (HIDA) scan is an imaging procedure used to diagnose problems in the liver, gallbladder, and bile ducts." See http://www.mayoclinic.org/tests-procedures/hidascan/basics/definition/prc-20015028. A CCK-HIDA scan adds medication CCK to the scan process in order to look at the contraction of the gallbladder. See http://www.mayoclinic.org/tests-procedures/hida-scan/basics/what-youcan-expect/prc-20015028.

Mullen assessed Plaintiff with back pain, headache and a rash and prescribed doxycycline for the rash. The prescription for meloxicam was still current.

On July 5, 2011, Plaintiff was seen by a nurse in the medical unit. At the assessment, Plaintiff reported to the nurse that his rash had cleared and denied any other problems.

On July 26, 2011, labs were drawn as part of Plaintiff's care in the Hepatitis CCC. Plaintiff's lab results showed Plaintiff's liver function remained within normal limits (i.e. the ALT, AST, Albumin and Bilirubin results were within the reference range). On July 29, 2011, the chronic care nurse assessed Plaintiff during the Hepatitis CCC appointment and advised Plaintiff that most persons with chronic Hepatitis C will remain healthy and will not develop serious liver disease and that medications may not be appropriate depending on the status of Plaintiff's disease.

On August 4, 2011, Dr. Mullen examined Plaintiff at the Hepatitis CCC appointment. Although Dr. Mullen observed Plaintiff's liver to be tender, Plaintiff's lab results showed liver function within normal limits and Plaintiff exhibited no signs or symptoms of decompensated cirrhosis. Dr. Mullen assessed Plaintiff's condition as stable and discussed with Plaintiff the process of workup for therapy and obtained written informed consent to begin the workup, for which the first step was to refer Plaintiff to mental health for assessment. Dr. Mullen also

requested a second viral load count ("hcv rna quant") following clearance of Plaintiff by mental health. Dr. Mullen ordered additional testing to determine whether Plaintiff was a potential candidate for interferon-based therapy.

On October 4, 2011, the nurse assessed Plaintiff for complaints of side pain and a rash. The nurse noted a rash to Plaintiff's back, torso and arms and observed that the side pain was associated with eating and lying down. The nurse referred Plaintiff to the physician for further evaluation. On October 11, 2011, the nurse assessed Plaintiff for complaints of red itchy areas on Plaintiff's face and to discuss questions Plaintiff had regarding treatment for Hepatitis C. Plaintiff incorrectly reported to the nurse that he had placed multiple medical service requests for his Hepatitis C, had never been seen by a physician and wanted to get started on medications. The nurse referred Plaintiff to the physician and issued hydrocortisone cream for the red areas on his face.

On October 17, 2011, Dr. Mullen examined Plaintiff for complaints of abdominal and lower back pain. Dr. Mullen observed spots on Plaintiff's abdomen and noted that Plaintiff was still lifting weights even with the low back pain. Dr. Mullen reviewed Plaintiff's lab results and noted no liver abnormality. Dr. Mullen assessed Plaintiff with lower back pain due to lumbar dysfunction and issued orders for benzoyl peroxide for the spots, Clindamycin (an antibiotic), and Salsalate for pain management.

On October 20, 2011, Dr. Mullen assessed Plaintiff and discussed the next step in the Hepatitis C workup, which was to evaluate the Hepatitis C Genotype, since Plaintiff received the requisite mental health clearance. Dr. Mullen submitted a referral request to evaluate Plaintiff's Hepatitis C Genotype and prescribed prednisone for arthritis pain. The referral request for Genotype evaluation was approved by Dr. Bynum.

On October 25, 2011, Plaintiff was scheduled for an appointment with the nurse to discuss the workup process for Hepatitis C, namely identifying Plaintiff's genotype. Plaintiff refused to have his vital signs recorded and reported to the nurse that he had already discussed genotype testing with the physician. The nurse instructed Plaintiff to follow up in sick call as needed.

On November 1, 2011, Dr. Mullen issued an oral order to have Plaintiff's leg xrayed because Plaintiff reported to custody that he was setting off the metal detector at recreation due to internal hardware inside of his leg.

On November 9, 2011, Plaintiff was diagnosed with Hepatitis C, Genotype 1a.

On December 9, 2011, Plaintiff refused the x-ray of his leg.

On January 18, 2012, Plaintiff's lab results showed Plaintiff's liver function was still within normal limits (i.e. the ALT, AST, Albumin and Bilirubin results were within the reference range). On February 2, 2012, Dr. Mullen examined

Plaintiff during the Hepatitis CCC appointment. Dr. Mullen noted that Plaintiff did not complain of HCV symptoms, reviewed Plaintiff's lab results and assessed Plaintiff's condition as stable. Having obtained mental health clearance and identifying Plaintiff's Genotype, Dr. Mullen adhered to the next step of the workup process, which was to request a liver biopsy to determine the stage of fibrosis since interferon-based therapy was medically indicated for patients with Genotype 1 and stage 2 or 3 fibrosis. Dr. Mullen submitted a referral request for a liver biopsy, which was approved by Dr. Bredeman. Dr. Mullen also prescribed Prednisone and alpha-lipoic acid for complaints of pain.

On February 10, 2012, Plaintiff reported to medical requesting the Hepatitis B vaccine. Plaintiff was educated that he did not need the vaccine because he already had the antibodies for both Hepatitis A and Hepatitis B. Plaintiff responded that he understood.

Plaintiff's liver biopsy scheduled for March 21, 2012 was cancelled because labs had not been drawn. On March 27, 2012, Dr. Mullen issued an order to reschedule Plaintiff's liver biopsy. On April 12, 2012, Plaintiff's labs were drawn in preparation for his liver biopsy. The lab results showed Plaintiff's liver function was, once again, within normal limits (i.e. the ALT, AST, Albumin and Bilirubin results were within the reference range).

On April 15, 2012, the nurse assessed Plaintiff for complaints of pain in his lower stomach, back, hands and feet. Plaintiff also reported needing to have blood work in preparation for his liver biopsy. The nurse recorded Plaintiff's vital signs and noted Plaintiff was alert and oriented to person, place and time, presented with clear speech and had a steady gait. The nurse also noted that Plaintiff had a prescription for arthritis pain, which Plaintiff admitted to not taking as instructed. The nurse educated Plaintiff on the importance of taking his medications as prescribed and noted that Plaintiff's blood work had been completed on April 12, 2012.

On April 18, 2012, Plaintiff underwent a liver biopsy, which showed Stage 1 fibrosis. After the liver biopsy, Plaintiff was monitored overnight in the transitional care unit ("TCU"), also known as the infirmary, and was issued a one-week lay-in excusing him from work and limiting his physical activities.

On July 12, 2012, Plaintiff's lab results showed Plaintiff's liver function was again within normal limits (i.e. the ALT, AST, Albumin and Bilirubin results were within the reference range).

On July 12, 2012, Dr. Mullen assessed Plaintiff during an appointment to discuss Plaintiff's Hepatitis C diagnosis and status. Plaintiff reported "dry heaves, [right] upper quadrant [abdominal] pain, bloating. Has had for months, radiates to right shoulder blade, worse with sloppy joes, chicken ala king, mostly fatty foods."

Dr. Mullen observed, "[right] tender sub costal with no palpable defect, normal bowel sounds, no guarding or rebound." Dr. Mullen assessed Plaintiff with cholecystopathy (i.e. disease of the gallbladder). Dr. Mullen also explained to Plaintiff that his results showed Plaintiff had Hepatitis C, Genotype 1a, stage 1. Dr. Mullen prescribed dicylomine to address the gallbladder issues, submitted a referral request for Hepatitis C therapy and submitted a referral request for a HIDA scan to further assess Plaintiff's gallbladder.

On July 16, 2012, Dr. Bynum deferred the referral request for Hepatitis C therapy, stating, "Patient does not meet criteria for tx [treatment] at this time. (Must be stage 3 [sic] for consideration at this time) F/U on site."

On July 16, 2012, Dr. Bredeman approved the referral request for the HIDA scan. On July 26, 2012, Plaintiff was sent on outcount to Mineral Area Regional Medical Center for the HIDA scan. The study showed "normal visualization of liver, gallbladder, bile duct and small bowel loops. No evidence of cystic or common duct obstruction." In other words, the results of the study were normal.

On August 9, 2012, Dr. Mullen assessed Plaintiff in the Hepatitis CCC. Dr. Mullen noted that Plaintiff was Genotype 1a, stage 1 and that Plaintiff did not report any Hepatitis C symptoms. Dr. Mullen examined Plaintiff's abdomen, reviewed Plaintiff's lab reports, and assessed Plaintiff's condition as stable. Dr. Mullen issued orders to continue to follow Plaintiff in the Hepatitis C Chronic Care

Clinic and submitted a referral request for a second HIDA scan since the previous imaging results had inadequate visualization of the gallbladder and pancreas. Dr. Bynum approved the HIDA scan.

On August 23, 2012, Plaintiff refused the appointment for his HIDA scan stating, "I don't need to go, there's no reason."

On September 11, 2012, the nurse assessed Plaintiff for complaints of pain in low back, stomach and right side. The nurse recorded Plaintiff's vital signs and noted that Plaintiff had a current order for Salsalate for pain management but Plaintiff reported not taking the medication as prescribed. The nurse educated Plaintiff on his medication regimen and referred Plaintiff to the physician for the results of the liver biopsy.

On September 28, 2012, Dr. Mullen met with Plaintiff to discuss the plan of care for Plaintiff's Hepatitis C. Dr. Mullen explained that Plaintiff's liver biopsy showed Stage 1 fibrosis for Genotype 1a, which did not indicate a medical need for therapy at that time.

On October 18, 2012, Dr. Mullen evaluated Plaintiff for complaints for low back pain and assessed Plaintiff with lumbar and thoracic dysfunction. Dr. Mullen prescribed capsaicin cream with instructions to apply to the areas of back pain and requested to follow up with Plaintiff in 8 weeks.

On December 24, 2012, Dr. Mullen examined Plaintiff during his 8 week follow-up appointment relative to complaints of back pain. Dr. Mullen observed thoracic interspinous narrowing and tenderness on the left and right lumbar pain and spasms and diagnosed Plaintiff with low back pain and thoracic spasm. Dr. Mullen prescribed half-sole arch inserts, eucerin cream and medications for plaintiff's asthma.

On February 12, 2013, Dr. Mullen evaluated plaintiff for complaints of shoulder pain "in the joint of the left shoulder increased with abduction of the shoulder and anterior flexion." Dr. Mullen assessed Plaintiff with bursitis and tendonitis and administered a dexamethasone injection. Dr. Mullen noted "Injected with dexamethasone, anterior approach, pain relief from the xylocaine immediate, no complications."

On March 12, 2013, Plaintiff's lab results showed Plaintiff's liver function was within normal limits (i.e. the ALT, AST, Albumin and Bilirubin results were within the reference range).

On March 14, 2013, Dr. Mullen evaluated Plaintiff during the Hepatitis CCC. Dr. Mullen reviewed Plaintiff's lab results and assessed Plaintiff's condition as stable. Dr. Mullen explained that interferon-based therapy was not medically indicated at that time based on Plaintiff's Genotype and fibrosis stage. Dr. Mullen

requested to schedule Plaintiff for another Hepatitis CCC appointment and additional lab work in 6 months.

On March 21, 2013, Dr. Mullen examined Plaintiff during a three month follow-up appointment relative to complaints of back pain. Dr. Mullen's findings were normal with the exception of a restricted range of motion of Plaintiff's neck with tenderness. Dr. Mullen assessed Plaintiff with "back pain, hcv [Hepatitis C], headaches from skeletal dysfunction" and prescribed amitriptyline for headache prevention and back pain and baclofen.

On June 24, 2013, Dr. Mullen met with the plaintiff for a review of his medications. Dr. Mullen noted that Plaintiff was complaining of "lethargy, some ataxia with falling to the [right] side, some vision changes, headaches, aching all over muscles, onset several months ago." Dr. Mullen examined and assessed Plaintiff with sinusitis. Dr. Mullen prescribed Guaifenesin for lung congestion and Amoxicillin. Dr. Mullen also requested to see Plaintiff in four weeks for re-evaluation.

On June 27, 2013, Plaintiff's lab results showed Plaintiff's liver function was within normal limits (i.e. the ALT, AST, Albumin and Bilirubin results were within the reference range).

On July 22, 2013, Plaintiff was scheduled for a four week follow up appointment with Dr. Mullen. Plaintiff failed to show at the scheduled appointment.

On September 5, 2013, Dr. Mullen evaluated Plaintiff during the Hepatitis CCC appointment. Dr. Mullen reviewed Plaintiff's lab results and assessed Plaintiff's condition as stable. Dr. Mullen noted that therapy was not medically indicated at that time based on Plaintiff's Genotype and fibrosis stage and requested to schedule Plaintiff for another Hepatitis CCC appointment and additional lab work in 6 months.

Plaintiff failed to report to his December 10, 2013 Hepatitis CCC appointment.

On April 14, 2014, Plaintiff's lab results showed Plaintiff's liver function was within normal limits (i.e. the ALT, AST, Albumin and Bilirubin results were within the reference range).  On April 15, 2014, Plaintiff failed to report to his Hepatitis CCC appointment.

On June 27, 2014, Plaintiff was scheduled for an evaluation and to discuss his CCC appointments but left without evaluation.

On August 8, 2014, Plaintiff's lab results showed Plaintiff's liver function was within normal limits (i.e. the ALT, AST, Albumin and Bilirubin results were within the reference range).

On December 23, 2014, Plaintiff's lab results showed Plaintiff's liver function was within normal limits (i.e. the ALT, AST, Albumin and Bilirubin results were within the reference range).

On December 30, 2014, Plaintiff failed to report to his Hepatitis CCC appointment.

On February 9, 2015, a site physician evaluated Plaintiff during the Hepatitis CCC. The physician reviewed Plaintiff's lab results and assigned an APRI score of .553; as such, therapy was not medically indicated at that time. The physician requested to continue following Plaintiff in the Hepatitis CCC and submitted a referral request for an ultrasound of Plaintiff's gallbladder and abdominal right upper quadrant, which was approved.

On June 22, 2015, Plaintiff's lab results showed Plaintiff's liver function was within normal limits (i.e. the ALT, AST, Albumin and Bilirubin results were within the reference range).

On July 24, 2015, a site physician evaluated Plaintiff during the Hepatitis CCC. The physician reviewed Plaintiff's lab results and assigned an APRI score of .387; in other words, therapy was not medically indicated at that time. The physician requested to continue following Plaintiff in the Hepatitis CCC.

On September 13, 2015, Plaintiff's lab results showed Plaintiff's liver function was within normal limits (i.e. the ALT, AST, Albumin and Bilirubin results were within the reference range).

As of March 2016, Plaintiff's condition has been assessed by his treating physicians as being in the early stages of Hepatitis C, with viral Genotype 1a, stage 1 fibrosis, a near normal liver enzyme count, and a relatively low viral load count, and no presentation of signs or symptoms of cirrhosis of the liver.

Hepatitis C therapy has not been and is not currently medically indicated for Plaintiff. The appropriate treatment regimen for Plaintiff is and continues to be to test and monitor his liver enzyme levels and APRI score in the Hepatitis C Chronic Care Clinic at least every six (6) months, which has been occurring and continues to occur. The treatment provided to Plaintiff is based upon his individual medical needs.

Hepatitis C is a blood-borne infectious disease caused by the Hepatitis C virus. Hepatitis C has six genotypes, 1 through 6, with each genotype having various subtypes (ex: 1a, 1b, 1 a/b, 1, etc.). Chronic Hepatitis C infection can cause inflammation of the liver, which can lead to progressive scarring of the liver (fibrosis) to advanced scarring (cirrhosis). Damage to the liver, or degrees of fibrosis, can be determined in the following ways: a. Liver biopsy. A very small piece of the patient's liver is surgically removed and analyzed to determine the

stage of fibrosis, ranging from 1, a very early stage, to 4.; b. AST-to-platelet ratio index ("APRI"); c. Abdominal imaging studies.

When an inmate is diagnosed with Hepatitis C, the site physician submits a referral request to the regional office for review and consideration of a plan of care for the patient. Treatment guidelines for Hepatitis C are based on those developed by the Federal Bureau of Prisons' ("FBOP") Clinical Practices Guidelines.

Consistent with FBOP Guidelines, therapy for Hepatitis C is medically indicated when the patient: a. Reaches Stage 2 or 3 fibrosis; b. Has an APRI score $\geq 1.0$, or whose APRI score is between 0.7 and 1.0 along with other findings suggestive of advanced fibrosis (i.e. low albumin or platelets, elevated bilirubin or INR); or c. Abdominal imaging studies, such as an ultrasound or CT scan, identify findings consistent with cirrhosis.

## Summary Judgment Standard

The Eighth Circuit has recently articulated the appropriate standard for consideration of motions for summary judgment, as follows:

> Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. The movant bears the initial responsibility of informing the district court of the basis for its motion, and must identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is

a genuine dispute as to those facts. Credibility determinations, the weighing of the evidence and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.

*Torgerson v. City of Rochester,* 643 F.3d 1031, 1043 (8th Cir.2011) (en banc)

(internal citations and quotation marks omitted). "Although the burden of

demonstrating the absence of any genuine issue of material fact rests on the

movant, a nonmovant may not rest upon mere denials or allegations, but must

instead set forth specific facts sufficient to raise a genuine issue for trial." *Wingate*

*v. Gage Cnty. Sch. Dist., No. 34,* 528 F.3d 1074, 1078–79 (8th Cir.2008) (cited

case omitted). With this standard in mind, the Court accepts the following facts as

true for purposes of resolving the parties' motions for summary judgment.

Plaintiff alleges defendants were deliberately indifferent to plaintiff's serious

medical needs.

The Eighth Amendment prohibition on cruel and unusual punishment

extends to protect prisoners from "deliberate indifference to serious medical

needs." *Gregoire v. Class,* 236 F.3d 413, 417 (8th Cir.2000).

In a deprivation of medical care case, the inmate must show (1) an

objectively serious medical need; and (2) the defendants actually knew of the

medical need but were deliberately indifferent to it. *See Grayson v. Ross,* 454 F.3d

802, 808–09 (8th Cir.2006). "An objectively serious medical need is one that either has been diagnosed by a physician as requiring treatment, or is so obvious that even a 'layperson would easily recognize the necessity for a doctor's attention.' "Jones *v. Minnesota Dep't of Corrs.,* 512 F.3d 478, 483 (8th Cir.2008). *See also Coleman v. Rahija,* 114 F.3d 778, 784 (8th Cir.1997). "'To establish a constitutional violation, it is not enough that a reasonable official should have known of the risk." Rather, a plaintiff must demonstrate the official actually knew of the risk and deliberately disregarded it.'" *Vaughn v. Greene Cnty., Ark.,* 438 F.3d 845, 850 (8th Cir.2006) (quoting *Farmer,* 511 U.S. at 837). The determination that prison officials had actual knowledge of a serious medical need may be inferred from circumstantial evidence or from the very fact that the risk was obvious. *See Farmer,* 511 U.S. at 842; *Jones,* 512 F.3d at 483. If prison officials have actual knowledge of a serious medical need, and fail to take reasonable measures to address it, they may be held liable for deliberate indifference. *See Farmer* 511 U.S. at 847. That said, "[a] showing of deliberate indifference is greater than gross negligence and requires more than mere disagreement with treatment decisions." *Pietrafeso v. Lawrence Cnty., S.D.,* 452 F.3d 978, 983 (8th Cir.2006) (quoting *Gibson v. Weber,* 433 F.3d 642, 646 (8th Cir.2006)).

When an inmate alleges that a delay in medical treatment rises to the level of an Eighth Amendment violation, "the objective seriousness of the deprivation

should also be measured 'by reference to the effect of delay in treatment.'"
*Beyerbach v. Sears,* 49 F.3d 1324, 1326 (8th Cir.1995), *abrogation on other
grounds recognized by Reece v. Groose,* 60 F.3d 487, 492 (8th Cir.1995) (quoting
*Hill v. Dekalb Regional Youth Det. Ctr.,* 40 F.3d 1176, 1188 (11th Cir.1994)).
Therefore, the inmate "must place verifying medical evidence in the record to
establish the detrimental effect of delay in medical treatment." *Crowley v.
Hedgepeth,* 109 F.3d 500, 502 (8th Cir.1997) (quoting *Hill,* 40 F.3d at 1188). To
prevail on a claim that a delay in medical care constituted cruel and unusual
punishment, an inmate must show both that: (1) the deprivation alleged was
objectively serious; and (2) the prison official was deliberately indifferent to the
inmate's health or safety. *Id.* When the inmate alleges that a delay in medical
treatment rises to the level of an Eighth Amendment violation, the "objective
seriousness of the deprivation should also be measured 'by reference to the effect
of delay in treatment.' " *Laughlin v. Schriro,* 430 F.3d 927, 929 (8th Cir.2005)
(affirming the district court's grant of defendants' motion for summary judgment
because plaintiff failed to offer evidence establishing any delay in treatment had a
detrimental effect).

Allegations of medical malpractice, inadvertent failure to provide adequate
medical care, or simple negligence do not amount to a constitutional violation.
*Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *Popoalii v. Correctional Med. Servs.,*

512 F.3d 488, 499 (8th Cir.2008); *Smith v. Clarke,* 458 F.3d 720, 724 (8th Cir.2006). Rather, the standard is met when the complainant establishes that the official "intentionally den[ied] or delay[ed] access to medical care, or intentionally interfer[ed] with treatment or medication that has been prescribed." *Vaughan v. Lacey,* 49 F.3d 1344, 1346 (8th Cir.1995). Furthermore, "prison officials do not violate the Eighth Amendment when, in the exercise of their professional judgment, they refuse to implement a prisoner's requested course of treatment," since prisoners do not have a right to any particular course of medical care. *Long v. Nix,* 86 F.3d 761, 765 (8th Cir.1996) (citing *Kayser v. Caspari,* 16 F.3d 280, 281 (8th Cir.1994)); *Taylor v. Turner,* 884 F.2d 1088, 1090 (8th Cir.1989). "[N]othing in the Eighth Amendment prevents prison doctors from exercising their independent professional judgment." *Long,* 86 F.3d at 765. Accordingly, under Eighth Circuit law, "mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Popoalii,* 512 F.3d at 499 (*quoting Estate of Rosenberg v. Crandell,* 56 F.3d 35, 37 (8th Cir.1995)).

Plaintiff claims that he should be receiving Hepatitis C treatment and that he should be receiving medication for his Hepatitis C. For purposes of summary judgment, defendants do not dispute that plaintiff had a serious medical need. What is at issue is whether defendants knew of this medical condition and were deliberately indifferent to it.

The undisputed facts in this case show that plaintiff was assessed and treated on a regular basis for his Hepatitis C.   Plaintiff was examined on a regular basis. Plaintiff was given medicines for various conditions, was advised with regard to the proper regimen for taking medication and was given necessary lay-in orders when needed.  His condition was closely monitored and liver biopsies were performed in order to assess his condition and the progression thereof.

The fact that Plaintiff has not received medication for his Hepatitis C does not establish deliberate indifference. It is undisputed that Plaintiff requests Hepatitis C therapy, but he has provided no evidence, other than his own opinion, that he requires this medication. "Prisoners do not have a right to any particular course of medical care." *Long,* 86 F.3d at 765; *Taylor,* 884 F.2d at 1090. Plaintiff is closely monitored and it is clear that Defendants will take the necessary action if Plaintiff's condition worsens to the point that Hepatitis C therapy is needed. Plaintiff may disagree with his physicians 'opinions, but under Eighth Circuit law, "mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Popoalii,* 512 F.3d at 499 (quoting *Estate of Rosenberg,* 56 F.3d at 37). The Court finds defendants were not deliberately indifferent to plaintiff's medical needs by refusing Hepatitis therapy

In sum, even if the Court accepts plaintiff's version of the facts with regard to his medical care, there is nothing in the record to establish that defendants

violated plaintiff's Eighth Amendment constitutional rights. Plaintiff has not established that there is a triable issue as to whether defendants deliberately disregarded his serious medical needs. The Court grants summary judgment in defendants favor.

Plaintiff brings § 1983 claims against Corizon, Inc., a corporate defendant for deliberate indifference to his serious medical needs. Citing to *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 690 (1978), Corizon, Inc. moves for summary judgment on the ground that plaintiff has failed to show the individual Defendants engaged in unconstitutional actions, therefore, Plaintiff cannot establish that Defendant Corizon is responsible for any policy or custom that was a moving force behind any alleged constitutional violation. *Mettler v.* Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999) The Court agrees that plaintiff's § 1983 claims against defendant Corizon should be dismissed. Corporations acting "under color of state law" are liable under § 1983 for their own unconstitutional policies or customs. *Sanders v. Sears, Roebuck & Co.,* 984 F.2d 972, 975–76 (8th Cir.1993). To state a claim against private corporation acting under color of state law, plaintiff must allege existence of "policy, custom, or official action that caused actionable injury" *Sanders v. Sears, Roebuck & Co.,* 984 F.2d 972, 975–76 (8th Cir.1993). Corporations acting under color of state law may not be held vicariously liable for the unconstitutional acts of their employees

under the theory of *respondeat superior. Boyd v. Knox,* 47 F.3d 966, 968 (8th

Cir.1995). Defendant Corizon cannot be held liable under 42 U.S .C § 1983 on a

*respondeat superior* theory and Plaintiff has failed to set forth any "policy, custom,

or official action" of Corizon, Inc. that caused him injury. Therefore, the Court will

grant summary judgment and dismiss plaintiff's § 1983 claim against Corizon, Inc.

Defendants correctly argue that Plaintiff has failed to present any evidence

of a civil conspiracy. Plaintiff's vague and conclusory allegations fail to establish

that Defendants engaged in a civil conspiracy against him. There are no

undisputed material facts that demonstrate that Defendants had a meeting of the

minds as to the object or course of action to pursue, that there was the commission

of one or more unlawful overt acts, or that Plaintiff suffered damages that were

proximately caused by the conspiracy. *See Gometz v. Culwell*, 850 F.2d 462, 464

(8th Cir. 1988). Defendants are entitled to summary judgment on Plaintiff's civil

conspiracy claims.

## Conclusion

Based upon the foregoing analysis, Defendants are entitled to judgment as a

matter of law. The undisputed material facts establish that Defendants have not

been deliberately indifferent to Plaintiff's serious medical needs. As such,

Defendants' Motion for Summary Judgment will be granted.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment, [Doc. No. 25], is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment, [Doc. No. 18], is **DENIED**.

A separate judgment in accordance with this Opinion, Memorandum and Order is entered this same date.

Dated this 30th day of September, 2016.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE